Thank you. Good morning. My name is Peter Wolfe. May it please the court, I represent Mr. Gilbreath, the defendant in this case. We're dealing here first, the first two issues have to be I have to ask you two to speak up and into that microphone. It seems to be a Put it up a little bit. Common problem. Is that loud enough? Yeah, that's better. All right. We're dealing here with a warrantless search. And because it's a warrantless search, it's presumed unreasonable. And if the government's determined to demonstrate some exception to the warrant requirement that would have permitted it, then here the government relies on consent. And so the question is, is the consent valid? And we maintain that the consent in this case is not valid because it was the product of an inherently coercive circumstance. Now, in my view, the district court analysis of this point went off on a slightly wrong proposition of law, and that's where the result came out the opposite of what it should have been. In the district court's written order denying the motion to suppress, the court said that the defendant's claim that his consent was a result of mere submission to a showing of lawful authority, however, is unavailing because there is no evidence that agents misuse their authority through a showing of unwarranted force or coercion. And that's not the test. There doesn't have to be any misuse of authority for consent to be the product of an inherently coercive situation. And so here what we have is Mr. Gilbreth is confronted at his door of his studio apartment at 645 in the morning by what appeared to be initially three law enforcement officers, two ATF agents and one HPD officer in uniform. And he's asked or he's told that they're there to inquire about his possession of a machine gun, and may they come in. And he invites them in. And there's no disagreement about that? That's right. Come on in. You can look at my... I don't have any machine guns, but if I did, you could look at them. I have a replica machine gun. You can look at that. You can check it out. You can check all my firearms. What Mr. Gilbreth is not asked to do and what he never consents to is the next thing that happens that's of any importance to this analysis, which is five other agents are invited into the apartment by one of the three agents who first are there. And so they then enter and begin a protective sweep of this small studio apartment. And Mr. Gilbreth, in the meantime, goes to get his replica machine gun and to show it to the agents. And as he's doing that, he's moving the apartment, Agent Lowe, who's the lead agent here, raises his aloha shirt so that Mr. Gilbreth can see that Agent Lowe is armed. But that wouldn't be a surprise. It's not a surprise. But nothing about what the agents did here is a surprise. And nothing about what they did, are we contending, was improper conduct by an agent. What we are saying is that when you tell three people you can come in and eight enter, when you tell the lead agent who's talking to you, let me show you my machine gun, and he raises his shirt so that you can see that he's armed, what's going on is the agent is doing exactly probably what he's been trained to do, which is he's establishing his control over the situation and he's making it clear to Mr. Gilbreth, look, this may be your home. It may be 645 in the morning. You're no longer in control of the situation here, sir. And at that point, I would submit that all that follows is the product of an inherently coercive circumstance. And if that's true, even without there being any misconduct, which we don't contend, or improper use of techniques by the agents, we have a search that's unreasonable, warrantless, and is not justified by what would be a valid consent because the consent is the product of a show of authority. Can I back up on that? Go ahead. Go ahead. I didn't understand that statement from the district court either, so I just didn't understand where it fit in. But here's my issue that I would like some help on. The district court, apart from that statement, did make a specific finding that the signature on this, I'll call it the global consent as opposed to the gun consent, was voluntary. And in order to overturn that, we would have to find that was clearly erroneous. So I guess I'd like to know, do you agree that that would be the standard and why, what would be the basis for overturning that specific factual finding? Well, I think the basis would be essentially what I've already stated. But in other words, that there was some coercion, that there was this implicit coercion? Or inherent coercion, right. Where within the factual scenario was the signing of the consent form? It was signed after the other agents had appeared and entered or? Yes. And after the sweep had been done and after, there's a slight discrepancy as to the testimony, but at least from Gilbreth's point of view, after he had asked to be able to take care of his son and had been told in effect that, well, we need to take care of this consent first. Let me make a comment on the search. If you could get this reversed on a search, in light of what's going on with the Fourth Amendment, it would be very unusual. But I don't want to make a decision on that. I do want you to at least address the 404B issue, which I think is interesting. All right. But may I first, before I do that, Your Honor? Go whatever you want to do. Because there's another aspect. Well, I'm prepared to do whatever I want, but I'd like to answer your question. But if I might put it off for a little bit. There's a separate aspect of the search and the consent, and that is the scope of the consent. Because there's no doubt. Let's say I lose on this first issue that I've raised. And let's say that the Court takes the view, look, he consented to a search of his apartment. That's what the written form says. But the entire circumstances, and indeed the agent's testimony, make it clear that the scope of what he was allowing to be searched was for a machine gun, or maybe even for firearms. If they had a warrant and went there and said, you can search for a machine gun, there would be no basis upon which they could have searched a three-inch brass box or a small medicine cabinet, because there's no likelihood, there's no reasonable notion that those containers could contain a machine gun. And there's no evidence of a tiny machine gun's existence in this record, and it's the government's burden on that point. So I think that the scope aspect of it wins it for us, even if the inherently coercive aspect doesn't. On the 404B, Your Honor, there was a … I know the background. All right. Tell me why it violates 404B on the cross-examination as you see it. Well, first of all, there's nothing but prejudice to be sought out in introducing evidence of five other firearms that aren't part of the indictment. No, I wasn't talking about the firearms. All right. I'm talking about the marijuana. Yeah. They never even proved that that incident occurred in the way it was argued or it was stated in cross-examination. In other words, the inference that the government sought to be … have drawn by the jury and what they explicitly argued in the closing argument was Gilbreth lied about possessing marijuana 10 years ago, and he's lying about it right here today, and these two things are more or less the same. But they never proved that he lied about marijuana 10 years earlier. Is there any testimony in the record that he gave that sort of same excuse, like, what me? I don't know how this got … I mean, somebody else put this here. It's not mine. Yeah. There is that testimony. That's a 12-year-old … That's right. There is that similarity. But unless you prove that the 12-year-old incident is a lie with some evidence … he was never even charged in that case. He was arrested but never charged. Then it's not an incident sufficiently proved to have actually have happened so that it gives you any information about what his intent was 12 years later. What they used it for was impeachment of his statement that somebody else put the drugs in the pipe and the marijuana in his bedroom or wherever it was. That's true. What I wanted to ask, I know that was a result of an arrest, but nothing was ever done. Was the fact of an arrest mentioned to the jury? I can't recall at this point. You don't recall. I didn't see it on the record. I think the answer probably then is the fact of the arrest was not mentioned. It was not. But they were trying to use this event to show that it was … he lied 12 years ago? He lied … Twelve years before the trial. And therefore, he lied on this occasion. That's right. And they never proved that he lied in the earlier incident. They just proved that there was an earlier incident where he received a jacket in the mail and apparently had become suspicious of the package and it showed that there was some marijuana in a pocket in the jacket that somebody had sent to him. So you've used your time. Do you want to save your remaining 15 seconds? I must. I'll give you more than 15 seconds. All right. May it please the Court, good morning. Tom Millick for the United States, Your Honor. Would you speak up? I'm sorry, Your Honor. Yes, sir. You tried this case. Yes, sir. Pardon me? I did, sir. Yes. Thank you. I tried this case. This was a case that we tried based on consent to search where individuals went to, from the ATF, two ATF agents and a Honolulu police officer, went to the defendant's residence, knocked on the door, showed their credentials, said we'd like to speak with John, we're with the police. They showed their identification as ATF agents. We'd like to talk to them. Apparently, a defendant came to the door with a pistol, a loaded pistol. He had had some neighbor next door, had had the police there before and was concerned. So he came to the door with a loaded pistol and said, just a minute, I'll close the door partially, put the pistol back by the TV, then went in and opened the door and said, come in. I'd like to talk to you, we'd like to talk to you about a machine gun. And he said, oh, you must mean my replica. And just a minute, he went to the back. At that point, the agents, he had said to come in, the agents asked for a protective suite. They motioned someone. Other agents came in. But at this time, he had brought a replica machine gun from the back of the apartment to the front, showed it to them. Now, Agent Lowe was concerned that he went out of his sight and he did pull up his Aloha shirt, put his hand on his revolver. The defendant came forward with a replica and he said, okay, just put it on the bed. He put it on the bed. And at that point, other agents came in. They'd been given permission to enter and look. And they did a protective suite. Not a search, just a protective suite. Okay, then you get to the issue that the defense counsel raised to the scope of the search. Yes. Because he comes in, they're asking about machine guns. Yes. He shows them his replica gun. And then they ask, then they want to search the whole apartment. Because the first part is to get the son out of the apartment. Yes. Make sure there's no other people in there. That's correct, Your Honor. And isn't it reasonable to think that what they're asking consent for is to search for guns. What they're asking Why do they need to go into all the nooks and crannies of the apartment? Well, in fact, the defense said they asked to look at his guns and stuff. And that the only reason they asked is if they could come in and talk to him. Well, stuff would, you know,  Small items. Possessions. That's the language of the defendant. They didn't get the consent and ask for consent to search until afterwards. The first thing they did was ask him if they could talk to him about his machine gun. No, I understand. So they talked to him. But then Yes. Then they get this signed consent. That's later. That's a few minutes later. Well, they don't do the whole search until they get that consent. That's correct, Your Honor. Both agents testified that two agents came in. They went to the left to You still haven't addressed my question. I'm sorry. We know the facts. I'm sorry. We've read the records. Okay. So the question is why, given that the whole discussion is about the guns, they've had the That's why he lets them in. That's what he sits and talks with them about. Why isn't it a fair understanding that the scope of the consent is limited to the guns? Because the form that was used to get his consent and the advice that was given to him, Your Honor, to get consent was the consent form, which was read to him, which was asked if he had any questions about that. It did not limit just to use a look or, excuse me, a search for weapons. It did not limit a search for the gun vault or the bedroom area. It did not limit it just to the kitchen area. It was for the entire apartment. Right. So he can search the entire apartment, but for everything? Well, it was the judge found where they were searching was reasonable. They were searching under a couple of towels in the bathroom where he could find a weapon, where one could have So then if you're searching under a towel and you feel a little thing, it's like, oh, maybe there's a machine gun in this little package. I mean Well, at that point, certainly the consent that was given was a broad consent as a court found So the government has to rest on the fact that it would be a global consent with no limitation on scope Yes. And as the court found it to be a full consent under that There seems to be a little tension with the notion that reaching into the towels is reasonable and searching for a firearm. If, once you get the container, which plainly doesn't contain a machine gun, you open it up, in the end you have to say that the consent form itself is a complete, is permission for complete consent. That part about, you know, there could be a firearm in the towels becomes irrelevant at that point. I agree, Your Honor. The fact that the district court made that observation suggests that, well, you know, you're supposed to view this objective reasonableness in the context of what the defendant gave his consent to. Could it be said that he might have fairly understood this consent to be following up on what he'd first been told, that they're looking for a machine gun? Well, Your Honor, if the court wants to go that way, the court can go that way, I suggest, I suppose. But what Judge Ezra did, what the district court did, and what we argued, was that when they initially went in, telling him what they were interested in, and then the consent that was explained to him, because Judge Ezra went back and said, wait a minute, are you just asking him to come in and look at the guns, or just look, or what? And he said, did you tell him anything else? He said, yes. We went over and we told him we would need a written consent. And that's when he explained the form, got the address for the form, explained to him what his rights were vis-a-vis that search, to deny it, to stop the consent, to have an attorney present, that he could refuse consent, and that he read each block to him. The defendant apparently watched him as he was reading and initialed each block. The judge did find, we agreed, that it was a full consent, a broad consent. I have a question. I guess he had a replica, some kind of a replica machine gun. And I think, how many rifles did he have besides a pistol? There were eight firearms, Your Honor. I believe three pistols and five long guns, five rifles. Were, was his possession of these weapons in any way unlawful? No. No. No, that was clear. So that had nothing to do with his being, being arrested. In other words, the guns are okay. He could have them. Yes, in fact, it came out, I believe, in the cross-examination of Agent Laurel, the ATF agent, that the police, the agents knew he had firearms in the residence, that they were registered. Yeah, you've answered my question. All right, sir. As to the, as to the court wish to me address the 404-B, you had some questions of Mr. Wolfe on that. Your opponent says, and I read the record on this, and it's pretty obvious, that you wanted this evidence of the act four year, 12 years earlier, to show that he lied 12 years previous. Therefore, he was lying, or the jury could find he was lying, when he said he didn't know anything about the marijuana and the pipe. And what I want to know is, where is it that you have in any way shown that his statement 12 years earlier was not the truth? He was never prosecuted. I know that he was arrested, but that's on the record. Right. And nothing was ever done. And where do you find a bad act if, in fact, we assume he told the truth when you haven't proved he was lying? That's my problem with your 404-B evidence, whether it came in on direct or cross-examination. Well, initially, the evidence we thought was that he was sent a jacket in the mail that he claimed was not his. At trial, he admitted the jacket was his, and claimed that the marijuana was planted, or he had no knowledge of the marijuana. Our position was that it was a In both instances, he had possession of something that is either a coat or an apartment. A little unusual. Well, that's what The fact that you thought it was a little unusual, to me, doesn't make it what we generally refer to as a bad act. In other words, what I'm saying is, the judge may have had it right when he didn't allow you to put it in on your direct examination. Correct. Well, I don't see the situation has changed on cross-examination, because it seems to me to argue that he lied then, and he's lying now. You have to show that he lied then, and I don't think you did. That's what bothers me. It may have been the instruction at that point was not as good an instruction as it should have been. We argued that it was impeachment, that the question that he had, or the situation that happened, and I believe it was ten years from the time of the incident, not twelve, that the first time he gave the story that was planted, didn't know anything about it, and quite unusual that we would want the jury to know that ten years later, the same unusual situation happened. How would that be impeachment? Well, impeachment to the extent that it negated a But isn't impeachment, you basically have what you're calling a parallel incident, but isn't impeachment that you're not telling the truth now? You're not telling the truth now. Well, impeachment can be not telling the truth. What else is impeachment? Impeachment that it doesn't make sense, that it doesn't pass logic, it doesn't pass a straight face test, that this situation in this case is a convenient excuse, and the jury should be able to determine that when they gauge how credible the statement is. It seems like this may be a case of going too far. In other words, you got it in, but you didn't need it necessarily. I mean, if your search is valid, you got him with the marijuana. And so you have this incident that is so remote, even if it were conviction, you'd be on the margins of time. Then our position is, as we put in a footnote, Your Honor, that it's harmless, because this had come in after the defendant, our direct examination, where the defendant was a habitual marijuana misery claim, he'd smoked it a couple of times a week, that he'd smoked it just a week before the search, and then it came in after the direct examination of the defendant that he admitted that he had used marijuana before, had used it I think the year previous at a Christmas party, that sort of thing. And then the instruction of the judge. This is just a classic case of you probably didn't need it, you went too far, I don't know how it's going to come out in this court, obviously, one way or the other. And it may be harmless, as you suggest, but with all that evidence, it seems amazing to me that the government would try to force... You had to, this is what you said, I want to quote you. Here's what you said about that evidence. My argument, Your Honor? Yes, that's Alford. Only to show knowledge on this incident, December 19th, and that was a 12 year earlier incident, and that it wasn't a mistake, and it wasn't an accident. So what you are doing is trying to prove that the earlier incident, which you couldn't prove it false, was false because you said it was false. And it's not shown to be a false incident. And the problem that I see is that you used it in a way that was very important in this case, because you had to show that he was a constant user. He denied that in his testimony. And this was a two-way street. It wasn't an accident that it was a lie when he said the marijuana the searchers found in his home was his, and he was a liar. And that's pretty strong impeachment evidence on something that was not a wrongful act. And that's what bothers me. May I respond, Your Honor? I see him out of time. Sure. Please respond. Thank you. If you look further in my argument, on the same page, with the same thought, I was arguing who to believe in credibility. In this case, I argued at that time that the defendant said he was, right after that argument, which the Court is correct in my quote, I argued that he claimed he was a habitual user only to get his, and the excuse for that was he was a habitual user only to get his son out of the apartment because he feared for his son's safety. And I argued that's a credibility call that you have to make, the jury has to make. So I submit, and I certainly didn't want to step on anybody's toes with a wrong argument, but I was trying to argue that if one makes a statement that just sounds a little bit unusual, a little bit difficult to understand, something that's just not normal, happened once, 12 years, then it happens again, or it's confronted again, and isn't the jury allowed to infer from something unusual credibility, or make an inference that he's, that it's not truthful, and that therefore he did know on December 19th of 2002, that was my purpose. Thank you. I think we have your argument. With this argument, plus the record, I think we have it in mind. Thank you, Your Honor. Thank you. Thank you. Mr. Wolfe, you may have a minute. Let me just address, then, the scope of the consent issue. Because if this was asserted. And just on that, he did say, I get consent for you to look at anything and any contraband or evidence of a crime could be seized. Except the entire context of the interaction before that is that they're looking for a machine gun or guns. And since the consent is taking the place of a warrant, which is what should have been obtained here, and there's no reason in the record why it wasn't obtained, if they went there with a warrant saying you can look for a machine gun or a gun, and they conducted the search in this way, it would have been blatantly beyond the scope of the warrant. And even Agent Lowe testified that Mr. Gilbreth could have well understood that what they were looking for was a firearm or guns. At least he said that at the outset of the interaction. And so the entire context of their discussion is about firearms, machine guns, and all the rest of it. And I think it's a case where the government, having created that context, or the agents having created that context, shouldn't now be heard to say that, oh, well, there's something extra special. If they'd written on the form, look, this is a consent to search your apartment, high and low, for every little thing, every document, every minuscule pill bottle we'll be looking in there, okay, I would have no argument. But the context is different here. Thank you. The case of United States v. Gilbreth is submitted.
judges: Bright , McKeown, Clifton